1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

HYPERTOUCH, INC., a California corporation,

        Plaintiff,

  v.

KENNEDY-WESTERN UNIVERSITY, a
Wyoming corporation,

        Defendant.
                            /

No. C 04-05203 SI

**ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

On February 24, 2006, the Court heard oral argument on defendant Kennedy-Western University's motion for summary judgment. Having carefully considered the papers submitted and the arguments of counsel, and for good cause shown, the Court hereby GRANTS defendant's motion for the reasons set forth below.

**BACKGROUND**

Plaintiff Hypertouch, Inc., is a California corporation run by James Joseph Wagner. Wagner started the company in order to develop haptic computer peripherals, although no such products have been released yet.[1] Hypertouch also provides e-mail services through servers located in California. For the most part, these services are provided free of charge. J. Wagner Decl. ¶¶ 7-8, 11. Defendant Kennedy-Western University (KWU) is an online university offering bachelors and graduate degrees in many areas of study to "mid-career professional(s)." KWU focuses its marketing on Internet advertising, including email advertising; it has in the past contracted with Peak Advertising and Boca

---

[1] A "haptic computer peripheral" would seem to be one that can move in the user's hand. *See* J. Wagner Dep. at 12:5-8.

1    Networks for its e-mail advertising campaigns.  Patterson Decl. ¶¶ 4, 19.

2        Plaintiff has filed suit alleging violations of 15 U.S.C. § 7704(a)(1) (part of the CAN-SPAM Act

3    of 2003) and Cal. Bus. & Prof. Code § 17529.5, seeking damages as well as injunctive relief.  Both

4    claims allege violations stemming from plaintiff's receipt of unsolicited e-mail advertising for KWU

5    that does not comply with the standards outlined in these two statutes.  Defendant has filed a motion for

6    summary judgment.

7

8                                    **LEGAL STANDARD**

9        Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and

10   admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any

11   material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P.

12   56(c)).  The moving party bears the initial burden of demonstrating the absence of a genuine issue of

13   material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The moving party, however, has

14   no burden to negate or disprove matters on which the non-moving party will have the burden of proof

15   at trial.  The moving party need only point out to the Court that there is an absence of evidence to

16   support the non-moving party's case.  *See id.* at 325.

17       The burden then shifts to the non-moving party to "designate 'specific facts showing that there

18   is a genuine issue for trial.'"  *See Celotex Corp.*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)).  To

19   carry this burden, the non-moving party must "do more than simply show that there is some

20   metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,

21   475 U.S. 574, 586 (1986).  "The mere existence of a scintilla of evidence . . . will be insufficient; there

22   must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v.*

23   *Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  In a motion for summary judgment, the evidence is

24   viewed in the light most favorable to the non-moving party, and all justifiable inferences are to be drawn

25   in its favor. *See id*. at 255.  "Credibility determinations, the weighing of the evidence, and the drawing

26   of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for

27

28
                                              2

**United States District Court**
For the Northern District of California

1    summary judgment." *Id.*

2

3                                          **DISCUSSION**

4    **I.       Defendant's Motion for Summary Judgment on Violation of the CAN-SPAM Act**

5              Plaintiff alleges a violation of 15 U.S.C § 7704 (a)(1), which makes it "unlawful for any person

6    to initiate the transmission, to a protected computer, of a commercial electronic mail message, or a

7    transactional or relationship message, that contains, or is accompanied by, header information that is

8    materially false or materially misleading."   Plaintiff claims that the header information at issue

9    contained domain names which were registered to false non-existent entities using false addresses.

10   Compl. ¶ 13.

11             Plaintiff further alleges a violation of 15 U.S.C. § 7704(a)(5)(iii), which makes it "unlawful for

12   any person to initiate the transmission of any commercial electronic mail message to a protected

13   computer unless the message provides a valid physical postal address of the sender."

14             Finally, plaintiff alleges an aggravated violation of the CAN-SPAM Act which makes it unlawful

15   for any person to "initiate the transmission" of a message that is unlawful under section 7704(a), or

16   assist in the origination of such a message by providing or selecting recipient addresses, where:

17             such person had actual knowledge, or knowledge fairly implied on the basis of objective
              circumstances, that
18

19             (i) the electronic mail address of the recipient was obtained using an automated means
              from an Internet website or proprietary online service operated by another person, and
20             such website or online service included, at the time it was obtained, a notice stating that
              the operator of such website or online service will not give, sell, or otherwise transfer
21             addresses maintained by such website or online service to any other party for the
              purposes of initiating, or enabling others to initiate, electronic mail messages; or

22             (ii) the electronic mail address of the recipient was obtained using an automated means
              that generates possible electronic mail addresses by combining names, letters, or
23             numbers into numerous permutations.

24   15 U.S.C. 7704(b)(1)(A).

25   Plaintiff alleges a violation of both above subsections, alleging that defendant used automated means

26   to obtain addresses from a website as well as automated means that generates possible addresses by

27

28                                               3

combining names, letters, or numbers.  Plaintiff asserts it has standing pursuant to 15 U.S.C. § 7706(g)(1), which allows suit by a "provider of Internet access service adversely affected" by a violation of the CAN-SPAM Act.

KWU contends that it did not "initiate" any emails to Hypertouch as required by each of the CAN-SPAM Act sections alleged in the complaint, and that Hypertouch does not qualify as a "provider of Internet access service" ("ISP") within the meaning of the CAN-SPAM Act.  The standing issue will be addressed first.

### A.  Is Hypertouch a "Provider of Internet Access Service"?

15 U.S.C. 7702(11) defines "Internet access service" as having the meaning given in the Communications Act of 1934, which provides:

> The term "Internet access service" means a service that enables users to access content, information, electronic mail, or other services offered over the Internet, and may also include access to proprietary content, information, and other services as part of a package of services offered to consumers.  Such term does not include telecommunications services.

47 U.S.C. 231(e)(4).

KWU asserts that Hypertouch does not provide access to the Internet within the meaning of this statute since its e-mail servers are connected to the Internet through DSL lines provided by ISPs Megapath, Speakeasy, and SBC.  KWU points to a Senate Report naming AOL, Microsoft, and Earthlink as examples of ISPs, and distinguishes Hypertouch from these companies since Hypertouch does not offer service packages or monthly rates and allegedly has no customers.  *See* REPORT OF THE COMMITTEE ON COMMERCE, SCIENCE, AND TRANSPORTATION ON S. 877, S. REP. NO. 102, 108th Cong., 1st Sess. 2-3 (2003).  KWU also contends that Hypertouch is not "adversely affected" as required by Section 7706(g)(1) of the CAN-SPAM Act, since the number of KWU spam messages was a minuscule percentage of the total number of spam messages received by Hypertouch over a two-year period, and that Hypertouch in any case does not own the domains and addresses to which the e-mails were directed.  Finally, KWU also points to Hypertouch's alleged failure to use spam filtering software on its servers

1    or opt-out from KWU emails as further evidence of a lack of adverse affect.

2         Hypertouch contends that KWU's interpretation of "Internet access service" would limit

3    standing under the Act to a few select corporations.  Hypertouch argues that it qualifies as an ISP

4    because it operates e-mail servers that support over two dozen domains and host over 120 e-mail

5    accounts.  Wagner Decl. ¶ 8.  Hypertouch asserts that it has provided in discovery over 2,000 mail

6    messages sent to its servers, mail server logs, screen captures, and declarations from three of its

7    customers.  *Id*. at ¶ 10.  Most of Hypertouch's customers receive e-mail services at no charge.  *Id*. at ¶

8    11.

9         An examination of the statutory language and congressional intent indicates that Hypertouch

10   should be considered to be a provider of "Internet access service" for purposes of the Act.  The plain

11   language of the statute indicates that a provider of e-mail service alone, without any other services,

12   qualifies as an ISP.  *See* 47 U.S.C. 231(e)(4) ("The term 'Internet access service' means a service that

13   enables users to access content, information, electronic mail, or other services offered over the

14   Internet").  While the ISP may also provide access to other services as part of a package, this is not a

15   requirement. *Id*.  Furthermore, the Senate Report notes that one of the justifications for the Act is that

16   "ISPs must respond to rising volumes of spam by investing in new equipment to increase capacity," and

17   also bear higher costs related to spam filtering and dealing with customer complaints.  It also notes that

18   free e-mail services may be forced to downsize as costs of spam increase.  *See* REPORT OF THE

19   COMMITTEE ON COMMERCE, SCIENCE, AND TRANSPORTATION ON S. 877, S. REP. NO. 102, 108th Cong.,

20   1st Sess. 6 (2003).

21        Hypertouch administers its own e-mail servers, and is therefore the entity that is potentially

22   forced to increase its capacity due to spam sent to e-mail addresses hosted by those servers, regardless

23   of who is listed as owning the domains associated with those servers.  That Hypertouch provides e-mail

24   service at no charge does nothing to change this fact.  In any case, the negative effect of spam on free

25   e-mail services was explicitly considered by Congress in passing the CAN-SPAM Act.  The means by

26   which an e-mail server is connected to the Internet, be it a DSL line or a direct connection, is irrelevant

27

28                                                5

since the server storage space taken up by spam is identical regardless of how that server connects to the Internet.

As for adverse affect, Hypertouch has submitted a declaration indicating that high spam loads have caused decreased server response and crashes, led to higher bandwidth utilization, and forced expensive hardware and software upgrades. Given the thousands of spam messages that plaintiff has shown were received by its servers, this is a reasonable statement creating an issue of material fact. Wagner Decl. ¶ 18. Finally, the argument on the alleged lack of spam filtering software on Hypertouch's servers is better characterized as an argument on a failure to mitigate damages, not that there is no adverse affect.

KWU also seeks to distinguish Hypertouch from the University of Texas, which was found by the Fifth Circuit to be an ISP through its provision of Internet access and email addresses to faculty, staff, and students. *See White Buffalo Ventures, LLC v. University of Texas*, 420 F.3d 366, 369, 373 (5th Cir. 2005). The attempt to differentiate *University of Texas* from the instant case is not persuasive. KWU asserts that the University of Texas presumably has its own direct Internet connectivity, but the Fifth Circuit decision does not mention anything about the way the University connects to the Internet. Instead, the court noted that the fact that users can access their University e-mail accounts from outside of the UT network was irrelevant, and then stated "we are hard-pressed to find that providing email accounts and email access does not bring UT within the statutory definition." *University of Texas*, 420 F.3d at 373. The Fifth Circuit's decision supports a finding that Hypertouch's provision of e-mail accounts and e-mail access brings it within the definition of a provider of "Internet access service." The Court finds that plaintiff Hypertouch is a "provider of Internet access service" for purposes of the CAN-SPAM Act.[2]

---

[2] KWU claims that Hypertouch is a "professional plaintiff," and has entered the ISP business for the sole purpose of bringing lawsuits under the CAN-SPAM Act. If that is in fact the case, this is a concern that can only be addressed to Congress, as this Court is not in a position to rewrite the statutory definition of "Internet access service."

**B.     Did KWU "Initiate" Spam E-Mail to Hypertouch?**

KWU contends that there is no evidence that it has "initiated" the sending of any e-mail to Hypertouch.  15 U.S.C. § 7704 makes it unlawful for any person to "initiate" the transmission of a commercial e-mail with any one of several characteristics, four of which Hypertouch claims apply to the e-mails at issue in this case.  Specifically, Hypertouch alleges that the emails contained materially false or misleading header information, lacked a valid physical postal address for the sender, were sent to an address harvested by automated means from a website, and were sent to an address generated using automated means.  Compl. ¶¶ 12-16.

For purposes of the Act, the term "initiate" is defined as to "originate or transmit such a message or to procure the origination or transmission of such message."  15 U.S.C. 7702(9).  In this context, "procure" means "intentionally to pay or provide other consideration to, or induce, another person to initiate such a message on one's behalf with actual knowledge, or by consciously avoiding knowing, whether such person is engaging, or will engage, in a pattern or practice that violates this Act."  15 U.S.C. § 7706(g)(2).  Plaintiff's summary judgment opposition brief only discusses KWU's liability in terms of its marketing agencies using unlawful means, and does not assert that KWU directly initiated the spam messages.  In addition, James Wagner has indicated that he has no reason to believe that KWU itself sent the e-mails.  Pl. Br. at 3:1-5, 5:19-6:16; J. Wagner Exp. Dep. at 85:21-24.[3]  Thus, it appears that Hypertouch is asserting KWU's liability under the "procure" clause, and its contentions will therefore be analyzed under that clause.

**1.     Were the e-mails sent "on behalf" of KWU?**

In order for KWU to be held liable for procuring the origination or transmission of the e-mail messages at issue, those messages must have been sent "on behalf" of KWU.  15 U.S.C. § 7706(g)(2).  KWU contends that there is no evidence that KWU or its agents sent the emails in question since the

---

[3] James Wagner has been deposed in his individual capacity as well as in an expert capacity, and this order makes separate citations to each.

plaintiff has not been able to trace them back to KWU, Peak Advertising, Boca Networks, or any other entity. In response, Hypertouch contends that since the emails consist of advertisements for KWU's education services and link to KWU web content, the only reasonable interpretation is that they were sent on KWU's behalf; the only alternative explanation is that KWU is the victim of a smear campaign designed to paint it as an e-mail spammer. The Court agrees that the very fact that KWU relies heavily on Internet marketing and that the emails at issue consist of KWU advertisements is enough to create an issue of material fact on whether they were sent on KWU's behalf.

### 2. Did KWU have "actual knowledge" or "consciously avoid knowing" of violations of the CAN-SPAM Act?

To be held liable under the "procure" clause of the CAN-SPAM Act, KWU must also have had actual knowledge that its agent would violate the CAN-SPAM Act or must have consciously avoided such knowledge. *See* 15 U.S.C. § 7706(g)(2). KWU contends that there is no evidence that it had actual knowledge, or consciously avoided knowledge, that any of its e-mail marketing agencies engaged in, or would engage in, a violation of the CAN-SPAM Act. To the contrary, KWU argues that the evidence shows that it has promulgated guidelines and practices to ensure that KWU and its agents are in compliance with anti-spam laws, including the retainment of an outside expert on an ongoing basis to vet and monitor e-mail marketing agencies hired by KWU. *See generally* Park Decl. (detailing KWU's guidelines and practices to ensure that its marketing agencies are in compliance with anti-spam laws, including the permanent termination of any agency that it finds to have engaged in a violation).

KWU has met its initial burden of demonstrating that there is an absence of evidence to support the element of knowledge that Hypertouch is required to prove under the CAN-SPAM Act. *See Celotex Corp.*, 477 U.S. at 325. The burden then shifts to Hypertouch to "designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (quoting Fed. R. Civ. P. 56(e)). Hypertouch has failed to provide any evidence that KWU had actual knowledge or consciously avoided knowledge of a current or future violation of the CAN-SPAM Act by anyone who sent the e-mails at issue; its opposition papers

simply make the conclusory statement that "KWU is aware that these third parties use unlawful email advertising as a means of increasing the exposure of KWU and the products it sells." Pl. Br. at 3:2-4. Hypertouch asserts that KWU's "refusal to investigate complaints" constitutes ratification through willful ignorance, but fails to provide any evidence of this alleged refusal to investigate. *Id*. at 6:4-16. Indeed, these unsupported statements are contradicted by James Wagner's deposition testimony that he has no evidence that KWU knew that e-mails on its behalf were sent in violation in the CAN-SPAM Act. J. Wagner Dep. at 152:21-153:18. During oral argument, plaintiff's counsel asserted that the declaration of Shea Park contains evidence that KWU "consciously avoided" knowledge that its agents were sending out messages that violated the CAN-SPAM Act. This assertion is simply false, as Park's testimony serves only to support the proposition that KWU actively seeks CAN-SPAM Act compliance from the marketing agencies that it hires. *See generally* Park Decl. (outlining KWU's anti-spam law compliance efforts).

As Hypertouch has failed to meet its burden, the Court finds that there is no genuine issue of material fact as to KWU's actual knowledge or conscious avoidance thereof of a violation or future violation of the CAN-SPAM Act by anyone sending commercial e-mail on KWU's behalf. Accordingly, the Court hereby GRANTS defendant's motion for summary judgment on the CAN-SPAM Act cause of action. The question of reduction of damages under the CAN-SPAM Act is rendered moot.

## II.     Defendant's Motion for Summary Judgment on the Alleged Violation of California Law

Since the federal claims have been eliminated before trial, the Court declines to exercise jurisdiction over the California statutory claim. *See Acri v. Varian Assoc., Inc.*, 114 F.3d 999, 1001 (9th Cir. 1997).

## CONCLUSION

For the foregoing reasons, the Court hereby GRANTS defendant's motion for summary judgment (Docket No. 89).

**IT IS SO ORDERED.**

Susan Illston

9

1    Dated: March 8, 2006

2                                        _____

3                                        SUSAN ILLSTON
                                         United States District Judge

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
                                        10